The Honorable, the United States Court of Appeals for the Fourth Circuit. Counsel you can proceed. Thank you and may it please the court, I am Matt Bogan here today on behalf of the appellant Covil Corporation. This court should reverse and remand this matter for two primary reasons that I will cover with the court. First, the district court failed to properly charge the jury on the law as it relates to substantial factor causation in a mesothelioma case. Second, the district court failed to conduct a proper comparative review of the verdict for excessiveness as required under the United States Supreme Court's decision in Gasparini which is based upon Erie v. Tompkins and which this court followed in the Steinke case. Either or both of these primary reasons warrants a reversal and a remand and at a minimum a remand with directives to the district court requiring comparative review as to whether a new trial absolute or new trial nisi remitter is necessary. As Gasparini noted, comparative review is a duty, quote, lodged with the district court as followed by this court in Steinke is a federal rule of procedure in which and through which the district court in comparing verdicts applies state substantive law in the review. I will cover first the issue of whether the jury was properly charged if it might please the court. Here, the district court failed to charge the jury in a sufficient manner by neglecting to charge that Ms. Finch needed to establish, that Mr. Finch rather, needed to establish he had frequent and regular exposure in close proximity to asbestos containing products supplied by Koval. And here that would mean under North Carolina law that Koval's product was a substantial factor in causing his disease here, mesothelioma. The test elucidated and before the court is in a case called Lorman and that is the burden the plaintiff must meet under the law as we've argued in our brief to the court. Here, in this case, I'll first turn to why that is the test if it might please the court. Lorman is the test and we asked Koval at trial at joint appendix 210 through 211 asked the district court to charge the Lorman factors which are proximity, regularity, and frequency. The district court refused to charge the jury properly on regularity and frequency. And here, I would note that at appellee brief page 15, the plaintiff seemingly concedes that Lorman is the proper test and if that were not further indicia enough that Lorman is the proper test which to charge the jury, at joint appendix 85 you'll find the Finch are pled in the complaint showing the plaintiff knows that's the burden it must meet under the law. And here... Counsel? Yes, ma'am. Counsel, can I ask you this question? I thought at JA 1018, 1021, you agreed, both counsel agreed that the Lorman instruction was appropriate. Well, your honor, I believe that part of the joint appendix that you're referring to is when the district court, after refusing to charge the Lorman charge we proposed at 210 and 211 offered an alternative charge and said, would we rather have the plaintiff's charge or the tailored charge that the court drafted and left with that option without waiving our objection. Earlier, under Lorman, we said we would go with the court's charge, so we sustained our objection... You said... I just want to be sure I understand what you think the record reflects because, honestly, I don't have 1018 and 20 to 21 in front of me, but you think that the record reflects there that you said, no, we don't want this instruction. In your honor, to make sure I'm quoting the page, you're saying 1118 to 1120, did I hear that correct, your honor? No, I said 1018 to 21. Okay. Yes, ma'am. 1018 to 21. Okay. And I'm sorry, I'm searching. Yes, ma'am. At trial, we did not waive our objection that we wanted the Lorman factors charged, and I do not believe, and I think the record shows that when the district court offered us the lesser harm for alternative charge that we think is still improper, we took that versus the plaintiff's. And I don't think that is an acquiescence that gives away our objection that Lorman, the charge we wanted at Joint Appendix 210, should have been charged, your honor. Okay. But what I'm asking you is, I understand your position is that you didn't waive anything, but did you say that to the district court? Yes, ma'am. And I'm turning to the page now. Okay. And I think... That's your position? Fine. Yes, ma'am. And thank you. And sorry for the delay in answering that, but I wanted to be sure, your honor, didn't have it in front of me. But that is the reading, and I think that's what the record reflects, your honor. Yes, ma'am. And I want to be sure that we're speaking the same language here. I understand you thought that your instruction was preferable, but I also understand from your answers that you said to the district court, no, we don't accept this. Yes, ma'am. Our instruction was nothing. Okay. But it would be fair, your honor, and not to back up, but when posed with, if I'm not charging yours, but I'm giving these two other options, we chose the court's charge versus the plaintiff's, which again, the record... Okay. Yes, ma'am. I think we understand. Thank you, your honor. And here, with that charge being asked and requested, your honor, the district court seemingly did not disagree that Lorman was the proper standard, but here attempted to charge, or tailor a charge, rather, that failed to adequately address frequency and regularity. Is it related to... I'm going to ask about that, because part of, as I understand the district court's reasoning here, part of the reasoning was that you were dealing with a different contaminant here, for lack of a better word. You were dealing with mesothelioma versus asbestos, different diseases, and there appeared to be evidence in the record that showed that in this case, in the case of Mr. Finch's disease, that that could be caused by a much lower degree of exposure, and so it seemed like the district court was trying to account for that. Lorman was a case about asbestos, this was a case about mesothelioma, and he tailored the instruction to reflect that fact and to reflect the evidence in the record, but it seemed to me that, by and large, the instruction did parrot the language of Lorman, so I'm going to point to you where it is that that instruction fell short, because it doesn't need to be precisely the instruction that you asked for, so long as the instruction correctly recites the law, and in substantial form, assuming that your instruction correctly is the correct rule of law, your Lorman, but that the instruction that was actually given conformed substantially to the requirements of Lorman, as modified by the particular circumstances of this case. Judge, thank you, and I tracked there, and I'm going to do my able best to make four points and answer it reasonably, and I'll start, Your Honor, if you'll allow me, with Joint Appendix 11-14, 11-14-21 through 11-15-5, and Your Honor, that is the as-given charge from the district court, and what our issue there, Your Honor, and why it matters under Noll v. Arston, the factors you alluded to on the standard of review here on what was properly charged, is it matters based on the evidence, and where the failure, I think, Your Honor, in the attempt to tailor, is the judge failed, it talked about Mr. Finch working around places where cobalt asbestos insulation was, but it did not talk about the duration of the time he worked around those products, it just talked about how the charge only discussed how long he worked at the plant, which is not the same thing, Your Honor, as around those products under the substantial factor causation test under North Carolina law. You also, the judge also did not charge frequency, how frequent he did that, and Your Honor, it matters here under the Noll v. Arston test, which our charge, we think, was correct, and was not substantially covered, as I've just covered, and why it was important. Your Honor, if you'll permit me, why it was important here, I will highlight in the record four places in this joint appendix that show it made a difference and mattered here in our estimation, Your Honor, and remember Mr. Finch worked as a tire presser at Firestone, and those contained asbestos pads not manufactured by cobalt, instead, sold, rather, by cobalt, instead, the asbestos-containing products, which cobalt sold, ordinarily called KALO, was insulation, and Mr. Finch did not work on those steam pipes that contained the insulation, and here's why it matters, Your Honor, failing to charge frequency and regularity. At Joint Appendix 675, 16-17, and I'm sorry to read to this court, but since we're not Mr. Finch said, no, no, and at 687, Line 21, when asked, were you around when the steam pipes covered in the KALO insulation were repaired, were you around, he said, I left and went somewhere else. When asked at 694, Lines 19-21, did he have any idea how often the insulation was replaced, he says, no, and at 696-697, which is 696-23-25 and 697, Line 1, did he ever mess with the insulation steam pipes behind his tire press, he says, no, they were behind the press, and so, Your Honor, the reason the Lorman standard, what is the standard, is if there were any doubt, Your Honor, if it weren't conceded that Lorman's the test, if there weren't enough case law, for instance, Jones v. Owen Corning, in which this court cites Wilder v. Ametek saying substantial factor causation is the test, if there were any doubt, Your Honor, that that's the test, I would point you no farther, and this goes just to your question about the differences in disease, it's the same alleged toxic chemical, but asbestos and mesothelioma, I don't think it makes any difference in charging that Lorman was an If we had to predict what North Carolina was going to do, assuming it wasn't clear already, I would point you no further than North Carolina workers' compensation law and North Carolina general statute 9753, Your Honor, in which it says, in a toxic asbestos setting, the employee must be exposed to chemicals in such form and quantity used with such frequency as to cause the disease, and that's the substantial factor causation that North Carolina has. Let me ask you about that, Mr. Bozeman, I'm sorry to interrupt, but the instruction did direct the jury to determine, and I'm quoting here, whether the evidence establishes the degree of exposure, and I'm paraphrasing a little bit here, required to cause mesothelioma, doesn't that suggest an indication to the jury that they have to consider the frequency in light of the evidence that you've just summarized? And, Your Honor, that's just above the sections at Joint Appendix 111.14 that I talked about earlier, and in that section, Your Honor, I do think that sets forth the standard of substantial factor causation, but then the factors, Your Honor, is where the district court didn't quite get to the goal line on charging what those factors are, because substantial factor causation is the charge, is the law in North Carolina in many different settings, but when it comes to a toxic tort exposure, you then have to elucidate the three factors of regularity, proximity, and frequency, and the failure to get across the goal line on proximity.  Yes, yes, ma'am. So, the instruction said you should consider how much cobalt insulation was in the plant, what portion of that insulation contained asbestos, how closely, that's proximity, this district worked around the places where the cobalt asbestos containing insulation was, the amount of dust from cobalt asbestos containing insulation products, frequency, how long, regularity, Mr. Finch worked in the plant. So, it seems to me, although not in the exact language of the prior case, the instruction did cover the points that you are worried about, proximity, regularity, and frequency. So, there's no law that says you have to do precisely the instruction, word for word, is there? No, ma'am, and I don't mean to pretend otherwise. Okay. But, I'm sorry, Your Honor. I mean, you can spend all your time on the instruction, but you might have some other arguments, too. Yes, ma'am, and I'm happy if the court wants to ask other questions to move on, because I see I'm quickly running short on time, and I won't talk too fast, but I will, and I think this may be the preeminent issue where the district court failed to engage in a comparative verdict analysis of similar North Carolina cases, and I think, Your Honor, that warrants a reversal and a remand to the district court with instructions to engage in this comparative verdict analysis, and as this court's very familiar, Judge, Justice Ginsburg's opinion and Gasparini is kind of the head of the anatomy of this body of law in which she said, you must, as a rule of federal procedure, compare like state court verdicts arising from that state court when a federal court sits in diversity to ensure compliance with the twin aims of Erie versus Tompkins, and shortly after the Gasparini decision was handed down in 1996, this court in the Steinke case engaged and remanded, in the Steinke case, to the district court in order to engage in a comparative verdict analysis, and that was not done here, Your Honors, as the joint attendance at 1319 through 1322 reflect. The district court, despite our urging to engage in a comparative analysis, refused to do so, and we think the failure to do so, I think it's a two-tier gate. First, Gasparini requires the comparative, and two, the district court then has to say, I've done the analysis or I've found no cases that are like this one, and here's why, and the second part is where we're lacking here because the refusal of the district court to engage in the analysis, it didn't tell us whether this case was like or within the merits of being similar to others, and in fact, Your Honors, I think it's an outlier as our briefing shows, and I think the district court under Gasparini and Steinke must show and show its work as to why that's justifiable, and I think the failure to do so here warrants and mandates a reversal, and yes, yes, are you saying that Gasparini would have come out the same regardless of whether or not there was, as was the case in Gasparini, a district court statute that required a state, in that case, a state appellate court to consider whether or not a particular damage award was within the can of reasonable, and I'm not reciting the standard exactly, but that required a comparative analysis, you're saying that regardless of that statute had not been there, that Gasparini would have come out the same way? First, yes, Your Honor, it would, and to prove so, I would point you to this court, the Steinke decision in which, under South Carolina law, this court instructed the South Carolina district court in a compensatory damages case, just like this one, no punitives, to engage in a comparative analysis, and like North Carolina, South Carolina doesn't have a statute mandating comparative review in compensatory damages cases, instead, it's a rule of federal procedure, so yes, Your Honor, Gasparini would come out the same way, and I think this court proved it in Steinke, even notwithstanding that New York statute, Your Honor, and Your Honor, I see- Yes, but I have one other question to ask you along the same lines. The Gasparini court didn't suggest that this was a rule of procedural law in New York, did it? Well, no, ma'am, and I didn't mean to indicate otherwise, it's a two-step process. So it was because it was substantive law in New York that the court followed it, right? Well, I think that that was- I don't think that's because, Your Honor, and I want to be- I think the analysis is the Gasparini court said, here's the standard in New York, and you must follow it, just like this court in Steinke said, passion and prejudice is the standard in South Carolina, you must follow it, go compare, and follow that rule. And I think that was what was lacking here is first the comparison, and then the application of the state standard. So I don't think North Carolina changes the analysis. I think that is the standard by which the court is governed, and here, in North Carolina, sitting in diversity, would be passion and prejudice or something not in evidence that explains why the verdict was an outlier. So I don't think the results changed, and I think this- unless this court, I think, changed its path from Steinke, I think that is this court following Gasparini and saying, this is a rule of procedure, and then you apply the state substantive law, and that was just what was done in Gasparini. But Mr. Boggan, so you just identified the standard that is in North Carolina when a court considers whether or not a standard claim is excessive, and that is when it's the influence of passion or prejudice, but that doesn't suggest any kind of a comparative analysis, and so I'm not clear to me why you would look to other cases to decide whether or not it was passion or prejudice in this case. You just looked at the record. Well, Your Honor, I would disagree, and I would point the court to two things. The Fortinot decision in which this court in 2013, after a district court in the Western District of North Carolina, from $10 million down to about 4.3 after setoffs, it remanded saying it was excessive, and Your Honor, what you just said, I track entirely, but in Fortinot, if we go to the district court record, and that's case number 10-125, which Chief Judge then Chief Judge Conrad had at docket 173, at page 30, Your Honor, there Chief Judge Conrad engaged in a comparative verdict analysis, so in Fortinot, this court remanded and said it was excessive on the record there because the district court had engaged in the comparative verdict analysis that I think Gasparini and Steinke mandate that district court do. It's a duty lodged, quoting the Supreme Court, with the district court, and in Fortinot, which Judge Moss participated in, in Fortinot, the verdict was reversed as excessive there on a companionship verdict and went back to the district court, but the district court had already engaged in the comparative analysis, so I think that, Judge, she has to answer your question. I think the analysis matters because here on this record, I think if the district court looks at comparative cases, which we briefed to this court and to the district court and cited, that this one doesn't look like the others, and Gasparini mandates two steps, one, the comparison, and two, an explanation of why it's okay this one doesn't look like the others, therefore, to meet the twin aims of Erie v. Tompkins, to ensure that the state court matches or similar to those granted by a jury sitting in a diversity court and district court. Counsel, I think I heard your buzzer saying your time had expired. Does anybody have further questions? No. You probably have reserved some time for rebuttal, have you? Yes, ma'am, four minutes, and thank you for the extra time you permitted me in answering your question. Thank you. Ms. Shirley? Yes, Your Honor. May it please the court. My name is Lisa Shirley. I represent Eppley and Finch. To put the case in context, a unanimous jury found Koval liable to the Finches under both negligence and failure to warn theory and awarded damages for Mr. Finch's pain and for his family's losses from his death. The district court observed the witnesses, the attorneys, and the jury, and considered Koval's challenges to the verdict in a 67-page opinion in which she found no merit to Koval's argument. The court found Plaintiff's evidence on liability and damages to be both persuasive and compelling. The district court concluded that, quote, the fact that Koval lost and the jury returned a large verdict is explained by the evidence, not by passion or prejudice. Now, this court reviews the district court's rulings for an abuse of discretion. Koval has not met that high burden. To touch on the Lorman instruction argument, the standard of review that this court brings to this is that Koval has a heavy burden in challenging the instructions because the trial court has so much discretion to fashion the charge. And counsel mentioned Knoll v. Artson, which both parties have cited in the brief. And I wanted to bring some language from that opinion to the court's attention that echoes some of the comments that have been made, which is that an appellate opinion does not necessarily provide the exact language for a jury instruction. It provides the general principles of law that are to be used. But the district court judge has the discretion when formulating instructions to use the appellate opinion in formulating the instructions to tail them to the facts of the case. And what Knoll said on page 588 is that appellate opinions are not jury instructions, nor are they meant to be. Rather, they articulate general principles of law that decide cases. Of course, appellate opinions may guide a district judge's discretion when formulating jury instructions, or even bear upon the formation of pattern instructions. But they are no means intended to preempt a district judge's discretion to formulate a suitable charge for a specific trial. And here, that is exactly what the district court did. She fashioned the causation instruction to take those Mormon factors and apply them to the facts of our case. The facts of Mr. Finch's, or what the evidence showed about his exposures in the Firestone plant, as well as the disease at issue. And as the court has noted, each factor was included in the instructions with the specific application to the facts. How much dust was there? How long was he around it? How close was he to it? Et cetera. I would also point out that the instructions really required a higher standard than Mormon. Not a lower one, as Coble has claimed. Because the instructions said that the jury had to consider the scientific evidence of how much exposure is required to cause mesothelioma, and whether Mr. Finch had that level of exposure. And that is a whole other hurdle for the plaintiff to have to have met. And Shirley, can I ask a question? Because you jump right into the substance of the instruction. Judge Motz asked your colleague whether he had adequately preserved this issue to begin with. I thought, I recall, that your brief suggested that they had not. Are you now conceding that? No, Your Honor. No. I do think there's a preservation issue here. I do think there's a preservation issue that the court can address for the court. I don't want to throw you off your game here, but if there is a preservation question, then I guess we would have to answer that. First, as I understood your colleague's position, is he was faced with a Hobson's choice, and chose the lesser of two evils. But he made every effort, if not expressly, at least implicitly, to preserve the principal objection. And that is that the Lorman instruction, in its original form, was the appropriate one. And any deviation from that was being done at the court's peril. Well, Your Honor, I do think Coble originally raised the objection about the exact language of the Lorman charge. But later in the hearing with the court, there was some debate about particular language, and the court gave Coble the option. And Coble said that they preferred the court's charge as it sits. And at that point, the district court interpreted that comment to be an agreement to the charge. She said on the record, that appears to take care of your appeal problem. And Coble, at that point, was completely silent, and didn't raise an additional objection, or explain that they had a continued objection to the exact language that the court intended to charge the jury. So, while they may have initially raised the objection, they later waived it by saying that they agreed to the court's charge. So, I can't agree with Coble's counsel that they preserved that issue, even after the district court flagged it for them, that, you know, it appeared that they were agreeing. Okay. Go ahead. Okay. Well, just to sort of reiterate what's been discussed a little bit, the trial court was on the actual language that she used, was taking account of the evidence in the case. The fact that the medical evidence in our case is that mesothelioma is quite different from asbestosis, which was the disease at issue in Mormon. In Mormon, the court did the same thing, considered the evidence about asbestosis, and that it actually takes quite a lot of exposure and quite a lot of time to develop. And whereas mesothelioma is the disease, that medical evidence in our case was completely uncontradicted by Coble. There was no medical expert brought by Coble to say that that was not the case. And so, when the court fashioned the charge, she was doing it based on the evidence in the case. I would also point out that the district court pointed this out, and I would note that Mormon has been interpreted by other courts and by this court as a sufficiency of the evidence standard, not necessarily a jury instruction. And in this court's opinion, in Hayslip, there was a similar situation in which the plaintiff won. The defendant, Owens Corning, an insulation manufacturer, appealed, and their argument was that it was a sufficiency of the evidence argument. And there is no indication in that opinion that the jury had been charged on Mormon. And instead, this court utilized the Mormon test to review the verdict to determine if the evidence was sufficient to support the jury's findings. If Coble had wanted to challenge the sufficiency of our evidence, then Mormon would have been a proper sufficiency of the evidence review standard. But Coble should not challenge the jury's findings. I'm sorry to interrupt you, but I do want you to have enough time to talk about whether there should have been a comparison purpose, comparison analysis to the amount of the award here, since that, it seems to me, is a huge award, biggest award I've ever seen. So maybe  you could talk a little bit about that. Yes, Your Honor. I will turn to that issue. Thank you. This is also an abuse of discretion standard. What the, what did the district court, how the district court chose to review the jury's verdict is an abuse of discretion standard, as discussed in Gasparini. The first point I want to make here is that Coble did not preserve its Erie argument. We recognize that Coble asked for a verdict comparison in the district court, but there was no argument that it was a requirement of federal procedural law. That was never raised in the district court, and the district court did not have a chance to address that issue in her opinion, her lengthy opinion, in which she absolutely would have addressed that if it had been raised. Because the court, district court, wasn't put on notice of that issue and did not have a chance to rule on it, that issue has not been preserved. And Coble also has not made the argument that its failure to preserve the issue is somehow excused because of fundamental error. So that issue, that argument has also been waived. So this whole issue of whether this is a federal procedural requirement should be considered waived. On the merits, however, I just cannot agree with Coble's interpretation of Gasparini. Gasparini holds that state law provides the standard for evaluating whether a verdict is excessive in a diversity case. And that is black letter law that even Coble cited at page 40 of its opening brief for this proposition. In Conkle v. Bob Evans Farms, this court acknowledged that Gasparini had overruled the 4th Circuit precedent requiring the application of federal law to evaluate excessiveness of a jury verdict. It can't be that both federal law and state law provide the substantive standard of review. The federal procedural law, excuse me, isn't there contention that this is a matter of federal procedural law and they rely on stinking? So what do you think? Also stinky. This case, Steinke actually holds that state procedural law provides the standard of review. It follows Gasparini. It never stated in that opinion that federal procedural law governs this issue. The ambiguity, I think, from Steinke comes in that when the court remanded and with instructions to compare verdicts, it cited federal law rather than South Carolina law. But subsequent cases have shown that the most logical reading of Steinke is that it was applying South Carolina law because South Carolina law provides that verdicts should be compared. In a subsequent case, Beverly v. Diamond Transportation, the defendant argued, made the same argument that Steinke requires a verdict comparison and the court rejected the argument that a verdict comparison had been required by Virginia law, holding that, quote, the district court is not required to review previous awards in similar cases. In our briefly discussed Eastern District of Virginia case, Benedict v. Hancock Tire Company, in which the court discusses this body of law at length and squarely addressed this issue of does federal procedural law govern this issue or not and held that under this court's precedent, it does not because, again, Steinke was decided under South Carolina law. This French case in which the court declined to compare verdicts, it was decided under Virginia law, which at the time discouraged such comparisons but did not prohibit them. In addition, the federal cases that Steinke cited, actually when you go look at those cases from the second and fifth, I believe, circuits, those cases say to follow state substance of law on this whole issue. You're quite clear that South Carolina law requires this comparison? Yes, Your Honor.  Yes. What if it didn't? I don't think that's an issue. What if it didn't? Sorry? Well, I think the district court has to follow whatever standard is provided by the state law. If state law either doesn't require it or prohibits it, then I don't think a federal court can do something different than what the state law provides. That is the whole holding of Gasparini. I'm sorry. Go ahead. To follow up on Jeff Mott's question, I guess the concern, not concern, but the question I have is, in reading Steinke, it does summarize South Carolina law at page, I can't see the page, but it talks generally about the standard, the trial judge has to exercise his discretion, must be convinced that the award isn't overly liberal, and then suggest that if the verdict appears so excessive as to indicate that it was a result of caprice, passion, or prejudice, then the trial judge and the reviewing court can set it aside. And that seems to be fairly similar to the standard in North Carolina, and yet Judge Wilkinson and Steinke said, as you pointed out, that in considering whether or not that the court should look to analogous South Carolina cases, and so that begs the question of whether or not that's a federal edict or something required under South Carolina law, and you say it's the latter, so what's the case that says that? Well, some of the cases cited by Coble, the Humphreys case and the Martin case, were both cases applying South Carolina law regarding verdict comparisons, in which a verdict comparison was done. Those are what I would point the court to right now. I would also just note that North Carolina law is quite different than South Carolina law. It is a passion or prejudice standard, but the North Carolina courts have been quite clear that there is no objective test like a verdict comparison, and in North Carolina, the case of Worthington v. Bynum, which we cited in our brief, is a North Carolina Supreme Court case from 1982. This is really a key case that discusses what it means to review a district court's decision on a motion for new trial, what it means to review it under an abuse of discretion standard, and the court declined to adopt any specific standard to define what is an abuse of discretion, and there the Court of Appeals had used the sort of more objective kind of standard looking to whether the verdict was within, quote, within the maximum limits of a reasonable range, and the North Carolina Supreme Court reversed that and said, no, we're not going to adopt any hard and fast rule like that. We're going to look, we're going to take it on a case-by-case basis and use our tried and true abuse of discretion standard. And so I would just say that's quite different from the South Carolina cases that do appear to compare verdicts. North Carolina law also indicates extreme deference to the trial courts in evaluating the existence of passion and prejudice. They recognize that the trial court judges are in the best position to evaluate the circumstances because they were present and witnessed the trial and the jury's reaction. And in North Carolina, the case law indicates that the discretion to review the verdict is practically unlimited. And those are the factors that led the district court here to properly reject a verdict comparison. Because of that extreme deference to the trial judges that is indicated in North Carolina law and the fact that they emphasized reviewing the evidence in the case to determine if there was passion or prejudice or if the amount of the verdict is actually based on the evidence. I would also push back on the idea that our district court refused to do the verdict comparison. She did look at the cases that were submitted by COVIL to her in the district court, which I'll note it was a completely different set of cases than has been submitted to this court. But leaving that aside for a second, what she determined from their submission was that there was not enough evidence regarding each supposedly comparable case to determine whether they were even analogous to this case. They had listed 11 cases and for most of them there was only an amount of an award. No actual details about what the evidence was or what the damages were. And it was impossible for the court to do that verdict comparison. Even if she would have wanted it or if the law had required it. She found that the verdicts had insufficient detail and the ones that there was some detail, the period of pain and suffering was different or the family relationships were different than what was presented in our case. And they also tried to get Yes? I was just going to ask you, what does the verdict form look like here? It's a very simple form. There are two liability questions and one damages question. And the damages question, I mean the damages is a lump sum that's awarded. And that included, you know, the jury was given detailed instructions about what types of elements they could award damages for which included Mr. Finch's pain and suffering during his lifetime and before his death. I think I'm remembering it now. It wasn't allotted. As you say, it was a general verdict, right? That's right, Your Honor. Yes, it was one amount for all damages, his damages and the family, which included his widow and three children. And they were all plaintiffs? Well, his estate, his wife is a plaintiff individually and is a representative of his estate. And so his children were entitled to damages through his estate. I was just going to point out, in terms of the practicability of doing a verdict comparison as COGOL has requested, they have now relied on an entirely different set of cases in this court than they relied on in the district court. And that, I think, alone is improper because this court's task is to determine if the trial court abused its discretion in reviewing the verdict and denying a motion for a new trial. And the trial court can't abuse its discretion in not considering cases that were never presented to it. Also, COGOL, the cases that it submitted 13 cases to this court, 12 of which are unpublished. And there's federal case law that holds it's really not proper to compare a verdict to unpublished cases because they haven't been tested through the appeal process. And there's just not as much information available on those verdicts. It also doesn't serve the purposes that COGOL claims of ensuring a consistent result in state and federal court because the issue is really, well, I mean, according to COGOL, if you're trying to get consistency, you would look to what would be upheld by a North Carolina court. And so that really requires looking at published cases and verdicts. And they've only cited one published mesothelioma case out of North Carolina, which is the Williams case. And that case was not a wrongful death case. It's really hard to compare this case in which Mr. Finch obviously passed and his family has damages from that. Whereas in Williams, it was only the plaintiff and his pain and it was a $7.5 million award, which COGOL says adjusted for inflation would be $9.3 million. But again, that's not, that couldn't really be fairly compared to the damages in this case that were much greater. Even if the court was to consider these unpublished verdicts, I would also point out that four of the twelve are over $30 million. That hardly shows that our verdict is an outlier or unreasonable. So, you know, in short, the district court properly followed North Carolina law in evaluating the award with reference to the evidence presented and whether it was influenced by passion or prejudice. And she found unequivocally that there was no evidence of passion or prejudice and that given the evidence in the case, which she reviewed at length in her opinion, that their unanimous damages award was not accepted given the evidence of damages that we had. The court found in reviewing the record, the court found that COGOL did not put on evidence about damages and offered little to no cross-examination of witnesses who testified about damages. Nor did COGOL substantively address damages during opening statements or in closing arguments. So the evidence of damages here, the court found that there was compelling and uncontradicted evidence that Mr. Finch's pain and suffering were substantial. And I can detail that in our brief, but it really was a terrible cancer that he had and his last month were quite bad. Our medical expert testified that he had, quote, eight months of a terrible, terrible course. So that combined with the damages that his family had suffered from his loss, we had evidence that was not contradicted that his life expectancy was 14 years. And the court found that the evidence was compelling that his death and that these losses were of a substantial value. And the evidence of his family's losses came from his widow and Mr. Finch's daughter, Lynn. And those were... Did I hear the bell ring a while ago? Or has your time expired? I apologize. I did not hear it. No, no, no. Maybe it didn't. I wouldn't swear to it. Does anybody have any further questions for Ms. Shirley? I think we understand your argument. Let me conclude. Okay. Thank you, Your Honor. Mr. Brogan, you said you had a short rebuttal. Yes, ma'am, I do. Quickly, four points Judge Dee asked that I'd like to make to a question you asked my sister at bar. Number one, South Carolina and North Carolina, substantive law are the same. Passion, prejudice, caprice, not in evidence. There is no state requirement in South Carolina that a district court or that a trial court compare verdicts. No case was cited because none exists. There may be some confusion in a punitive damages setting, which is not here. This is only compensatory damages under Gamble v. Stevenson. The court does do a due process check on the size of the verdict for punitive damages in South Carolina. But here this is a compensatory damages case as was I'm saying North Carolina, South Carolina. Two, to the assertion that we've somehow waived this argument, I want to go quickly to Joint Appendix 272 through 274. And there we cite the Klein case in which a comparison is done, the Gasparini case, the head of the anatomy of the body of this law, and then the district court to engage in this comparison. And here at Joint Appendix 1321 is what the district court said despite what my able sister at bar said. The court declined this invitation and concludes in its decision that a comparative approach would not be beneficial here. Gasparini didn't make it optional. It said it is a duty lodged with the district court. You made a good point about South Carolina law. We'll have to figure out if that's in fact correct. But your colleague also suggested that North Carolina isn't just silent about the issue of comparing verdicts. It affirmatively disavows or at least looks askance at doing such an analysis. And you seem to be saying that even in the face of an express prohibition that federal law would require that based on Gasparini. Is that your argument? Yes, sir. I think that is my argument. And I think that we can find decisions from this court even in Virginia where allegedly there's this prohibition against comparison. You would find it. So I think that is the duty. Let me follow up with that. That seems a bit odd because then the relative analysis of a verdict would tend to hinge on the mere fact that luck or bad luck of appearing in federal court versus state court. That seems a little bit arbitrary. No, your honor. I don't think it does. I think that it still keeps the federal court in diversity applying the subject state's law in line with the verdicts that come from state court. It's designed as twin aims to essentially forum shopping, as I understand it, your honor. But be that as it may, here, even if I'm wrong about that, your honor, it doesn't make a difference from this case because the state substantive law is the same and there's no bar in North Carolina or South Carolina against doing a comparison. The Worthington case, your honor, that was cited to you does not bar comparison. It just talks about the strict and high standard of overturning a verdict. And I'll point to your honors that another flaw in the district court's analysis, and I'm pointing to joint appendix 1306 footnote 21. The district court claims that she couldn't find a case under North Carolina law overturning a verdict for excessiveness. Well, that's another kind of pulling the Jenga box out of this analysis. In Edwards versus Upchurch, a case cited in Worthington, which was analyzed by the court, 193 S.E. 2nd 19, the North Carolina Supreme Court did just that and reversed the verdict for excessiveness. You argued Edwards in front of the district court? No, ma'am. We did not cite that case to the court. You want the district court to be omnipresent, to know every case in the world that's arguably on point, and yet you don't even cite the case which you're relying on. No, ma'am. And I don't mean to suggest otherwise that the district court has to be omnipresent. And forgive me if I found it that way, your honor. But as we know, I don't have to cite specific cases. And we argued that a comparison needed to be done. And I'm merely pointing out that the case Worthington, which is cited, your honors, I see I'm out of time. May I finish my answer to that question? Thank you, your honor. I'm merely pointing out that in the analysis of the premier case Worthington relied on by the district court, there's a flaw in her analysis. And I'm not suggesting, I wasn't there at the district court, I'm not suggesting that it has to be omnipresent and by no umbrage on that. If I might, your honor, one point I want to leave, I don't want to leave any doubt, even though it doesn't sound like I made much hay there, at joint appendix 1020 through 1021, your honor, the district court said, I'm going to leave the charge as it is, as to both of you all's objections. I think it fairly states the proximity, duration, and regularity. We didn't waive the issue, your honor. We preserved our objection. I just want to make the record reflect that. And unless there are other questions, in closing, what I'd say is we rely on any argument or brief if not made today. I think there's ample record to reverse this and the district court should conduct a comparative verdict analysis in two cases, the Williams v. CSX case and the decision in Fort Knott. Both of those decisions, one a meso case and one a companionship case, combined those verdicts in those cases were not but $15 million. And the Fort Knott case reversed because it was too excessive because there wasn't sufficient record evidence. The same is true here and I ask this court to reverse and require the district court to do the comparative analysis. Okay. Thank you very much, counsel. We very much appreciate your arguments. And we will try to get our opinion understood as possible. Thank you for accommodating these difficult conditions. I think the clerk will temporarily adjourn court. Is that correct? Yes. The court will take a brief break before hearing the next case.
judges: Diana Gribbon Motz, Albert Diaz, Max O. Cogburn Jr.